**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | |
|---|---|
| BRIDGET NAMONDO MBOME,<br><br>        Plaintiff,<br><br>   v.<br><br>HENRY NJIE, EMILIA NJIE, and MARY<br>MBELLA,<br><br>        Defendants. | CIVIL ACTION NO. |

## COMPLAINT

Plaintiff Bridget Namondo Mbome ("Ms. Mbome") files this Complaint against Defendants Henry Njie, Emilia Njie, and Mary Mbella (collectively "Defendants") and alleges the following:

### I.    INTRODUCTION

1.    Ms. Mbome brings this action for damages resulting from being trafficked into the United States from Cameroon by Defendants.  Ms. Mbome worked as a nanny, cook, and housekeeper for the Njies tirelessly for eight years.  Ms. Mbome has yet to receive compensation for this work.

2.    Defendants lured Ms. Mbome away from the only home she has ever known in Cameroon and secured her services by falsely claiming that they would obtain the necessary documentation for Ms. Mbome to travel to and work in the United States and would pay her for her work.  Instead, Defendants misled Ms. Mbome, confiscated her passport and visa, and mistreated her throughout the time of her service to them by withholding her compensation. Defendants exploited Ms. Mbome's lack of education, limited access to resources, and her

limited ability to speak English in order to make Ms. Mbome feel as though she did not have any exit options.

    3.      When Defendants no longer needed Ms. Mbome's services, they put her on a one-way bus trip out of the state so they no longer had to deal with her.

    4.      Defendants manipulated Ms. Mbome and took advantage of their power over her to force her out without pay.  Ms. Mbome was not compensated for her eight years of hard work. She is entitled not only to compensation for her labor but also damages for the pain and suffering she has endured.

## II.    JURISDICTION AND VENUE

    5.      This Court has original jurisdiction under 28 U.S.C. § 1331 as this is an action arising under the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. § 1595, and the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 216(b).

    6.      This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367.  Supplemental jurisdiction is appropriate because the state law claims are so related to the federal claims that they form part of the same case or controversy under Article III of the United States Constitution.

    7.      Venue is proper in the Northern District of Texas pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this District.

## III.    PARTIES

    8.      Ms. Mbome is a 72-year-old citizen of Cameroon who currently resides in Upper Marlboro, Maryland.

9.      Upon information and belief, Henry Njie is a United States citizen who currently resides in Arlington, Texas and may be served with process at 5103 Timber Cove Court, Arlington, TX 75052.  Mr. Njie is a pharmacist by profession.

10.     At the relevant times to this action, Mr. Njie was Ms. Mbome's employer pursuant to the FLSA, 29 U.S.C. § 203(d).

11.     Upon information and belief, Emilia Njie is a United States citizen who currently resides in Arlington, Texas and may be served with process at 5103 Timber Cove Court, Arlington, TX 75052.  Mrs. Njie is a nurse by profession.

12.     At the relevant times to this action, Mrs. Njie was Ms. Mbome's employer pursuant to the FLSA, 29 U.S.C. § 203(d).

13.     Upon information and belief, Mary Mbella currently resides in Arlington, Texas. At all relevant times, Ms. Mbella was acting on behalf of and for the benefit of the Njies, and her actions were taken in her capacity as the Njies' agent.

## IV.     FACTUAL ALLEGATIONS

14.     Ms. Mbome was born and raised in Cameroon from humble beginnings. She has never received any formal education, cannot read or write, and speaks very little English.

15.     As a young child, Ms. Mbome was taken in by nuns in a convent where she lived for years, cooking and cleaning each day.  During this time, Ms. Mbome lived simply and was very happy.  The experience instilled in Ms. Mbome a solid work ethic and a sense of pride in taking ownership over her work, even with respect to the most menial tasks.

16.     Ms. Mbome left the convent when she was a young woman in her late teens or early twenties. Her life in Cameroon was happy but was at times marked by tragedy.  She married shortly after leaving the convent and had a son, but the child passed away due to illness when he was just a teenager.  Before his death, Ms. Mbome's son had a young son of his own—

3

Ms. Mbome's grandson.  Ms. Mbome and her husband eventually separated.  Despite these hardships, Ms. Mbome managed to earn a living to support herself and continued to work well into her 60s.

17.     Around 2008, Defendant Mary Mbella, approached her about working for Defendants Henry and Emilia Njie as a housekeeper and nanny in the United States.  Defendant Emilia Njie is Defendant Mbella's daughter.  Defendants Henry and Emilia Njie are married.

18.     Ms. Mbella told Ms. Mbome that her daughter, Mrs. Njie, had asked Ms. Mbella to look for a housekeeper and nanny and specifically asked about Ms. Mbome.  Ms. Mbome knew the Njies in Cameroon very well and trusted Ms. Mbella, so she agreed to work for the Njies in the United States.

### Defendants Arranged for Ms. Mbome to Travel to the United States

19.     When Ms. Mbome told Ms. Mbella that she was interested in working for Defendants' family in Grand Prairie, Texas, Ms. Mbome had never traveled outside of Cameroon.

20.     Ms. Mbella informed Ms. Mbome that Ms. Mbella would handle the process of getting a passport and visa for Ms. Mbome to go to the United States.  Ms. Mbome accepted Ms. Mbella's help because she trusted Ms. Mbella and was unfamiliar with the visa process and requirements.

21.     Ms. Mbella told Ms. Mbome there would be a visa interview.  At the instruction of Ms. Mbella, Ms. Mbome, with a friend's assistance, obtained a photo of herself and certain supporting documents for the visa and visa interview.

22.     Prior to the interview, Ms. Mbella instructed Ms. Mbome to answer certain interview questions in a particular way.  Ms. Mbella prepared Ms. Mbome on what answers to give for many questions to ensure Ms. Mbome would get a visa.

23.     Ms. Mbella then instructed Ms. Mbome to meet her so they could travel to the United States Embassy for Ms. Mbome's visa interview together.  Ms. Mbome and Ms. Mbella went to the United States Embassy in April 2008 for the visa interview.

24.     Ms. Mbella brought the paperwork Ms. Mbome needed for the visa process, which Ms. Mbella completed in advance of the interview.  Because Ms. Mbome cannot read or write, Ms. Mbome depended on Ms. Mbella to complete the paperwork correctly.  Ms. Mbella never asked Ms. Mbome for her input in the completion of the visa paperwork.

25.     The interview was conducted in English even though Ms. Mbome can only effectively communicate in Cameroonian Pidgin English.  Ms. Mbome was not offered an interpreter.

26.     Because the interview was conducted in English, Ms. Mbella did most of the talking and answered most of the questions.  Ms. Mbome did not feel comfortable in front of the interviewer discussing with Ms. Mbella why Ms. Mbella was answering most of the interview questions.

27.     At the end of the visa process, Ms. Mbome was granted a six month B1/B2 visa to travel to the United States.

28.     Before leaving for the United States, Ms. Mbome asked Ms. Mbella how she would be paid by Defendants for her work.  Ms. Mbella instructed Ms. Mbome that she should never raise the question of compensation with the Njies because Mr. Njie knew what he intended

Plaintiff's Original Complaint

to pay her.  Ms. Mbella also informed Ms. Mbome that if Mr. Njie mentioned the topic of compensation, Ms. Mbome should not respond.

29.     Upon information and belief, Ms. Mbella coordinated with Mr. and Mrs. Njie regarding this instruction, the nature of the arrangement, and other material aspects regarding Ms. Mbome's travel to the United States.

30.     Although Ms. Mbome was used to negotiating her wages upfront, Ms. Mbome trusted Ms. Mbella and continued to believe that she would be fairly compensated.  Because of her conversation with Ms. Mbella, Ms. Mbome understood that her expectation that she would be paid was clear to Defendants.  Ms. Mbome believed that Defendants would pay her for her work and would not have accepted the job if she believed otherwise.

31.     Defendants purchased a plane ticket for Ms. Mbome, and she left for the United States on April 29, 2008.

32.     Upon Ms. Mbome's arrival, the Njies picked Ms. Mbome up at the airport in Dallas/Fort Worth and brought her to their home.

### The Njies Restricted Ms. Mbome's Life in Their Home

33.     After she arrived in Texas, Ms. Mbome spent little time away from her traffickers. Ms. Mbome typically worked for the Njies seven days a week for approximately 14.5 hours on weekdays and 13 hours on weekends.

34.     Her responsibilities included housekeeping, laundry, ironing, making the beds, cleaning the floors, taking out the trash, preparing and cooking all meals, providing for any house guests, and caring for the children, including bathing them, feeding them, preparing them for school, and putting them to bed.  The Njies had a four-year-old child when Ms. Mbome first arrived, a second child was born approximately one week after Ms. Mbome's arrival, and a third

child was born in 2012.  Ms. Mbome took care of the children as if they were her own.  If any other household chores or needs arose, Ms. Mbome was responsible for completing them.

35.     The Njies instructed Ms. Mbome on what services to perform and how to perform them, for example, how to do the laundry, how to prepare infant formula, what the children's schedule should be, and restrictions on what the children were allowed to do, such as limiting the amount of television they were allowed to watch.   The Njies accepted Ms. Mbome's housekeeping, cooking, and childcare services.

36.     Ms. Mbome did her best to follow all of the instructions she was provided.  If Ms. Mbome made a mistake, for example, burned a shirt while ironing it, Mrs. Njie would get upset and yell at Ms. Mbome to shame her.

37.     With all of these responsibilities, Ms. Mbome had little free time, and she typically only left the house to go to church services on Sundays when the Njies decided to attend.  The Njies did not go to church services every week, which was upsetting to Ms. Mbome because she wanted to go more frequently but depended on the Njies to take her.  Ms. Mbome does not know how to drive a car and did not have reliable access to other forms of transportation.  Further, Ms. Mbome felt she could not question the Njies if they decided they were not going to church services on any given week.

38.     Ms. Mbome's dependence on the Njies was nearly absolute.  Ms. Mbome was given a room in the Njies' home and depended on the Njies to provide her with basic personal care items, like soap and other toiletries.  At times, Ms. Mbome had to wait long periods of time for the Njies to replace her depleted personal care items, like rubbing oil for her skin.  Ms. Mbome would ask Mrs. Njie to replace the items, but Mrs. Njie claimed that she had forgotten and blamed Ms. Mbome for failing to remind her.  If Ms. Mbome had the chance to accompany

7

Mrs. Njie on a shopping trip, Ms. Mbome would sometimes attempt to bring an item to the register for Mrs. Njie to purchase for Ms. Mbome. Mrs. Njie would tell Ms. Mbome that she was responsible for buying her own things even though Mrs. Njie knew that Ms. Mbome had no savings and received no wages for her work.

39.     The Njies benefited from Ms. Mbome's labor in that they received childcare and housecleaning services at no cost. In addition, because Ms. Mbome attended to the chores, cooking, and childcare in the Njies' home, Mrs. Njie was able to attend and complete nursing school and obtain gainful employment in the nursing field. Ms. Mbome performed these services based on the initial request by Ms. Mbella, who asked Ms. Mbome to travel to the United States to care for Ms. Mbella's daughter, son-in-law, and grandchildren. In addition, when Ms. Mbella travelled to the United States to visit with the Njies, Ms. Mbella received the benefit of Ms. Mbome's housecleaning and cooking services because Ms. Mbome attended to chores, cooked, and cleaned for Ms. Mbella as if she were any other houseguest.

40.     Ms. Mbome worked tirelessly for the Njies for eight years without compensation.

41.     During her eight years working for the Njies, Ms. Mbome did not receive routine healthcare—despite being diagnosed with hypertension and experiencing occasional chest pains—and never had a sick day off work.

42.     Ms. Mbome heeded Ms. Mbella's warning to never raise the terms of her compensation with the Njies and relied on Ms. Mbella's assurance that Defendants intended to pay her. Despite knowing that they were legally obligated to pay Ms. Mbome for her services, Defendants never explained to Ms. Mbome any details regarding requirements that domestic workers like Ms. Mbome are to be paid a minimum wage, nor did they post or provide Ms.

Mbome with such information during or after her employment with them.  Defendants took these steps to willfully mislead Ms. Mbome regarding her rights.

### The Njies Confiscated Ms. Mbome's Passport and Visa to Restrict Her Movement

43.     After Ms. Mbome arrived in the United States, Mrs. Njie demanded that Ms. Mbome hand over her visa and passport.  Mrs. Njie represented that the Njies were completing the necessary process to extend Ms. Mbome's visa.  Ms. Mbome trusted and relied upon Mrs. Njie's representation and gave her all of her travel documents.  The Njies retained those documents for nearly all of the next eight years.

44.     On two separate occasions during her first two years with the Njies, Ms. Mbome asked to visit her nephew in Maryland.  On both occasions, the Njies gave Ms. Mbome permission to travel to Maryland, purchased her plane ticket, and returned her then valid passport for the trips.  When Ms. Mbome returned from these trips, the Njies asked for the documents back.  Ms. Mbome believed the Njies were still in the process of renewing her documentation and returned the documents to them.

45.     Ms. Mbome could not have gone on these trips to Maryland without the Njies' permission because they had her passport, and as Ms. Mbome was not paid, she had no money to pay for the plane tickets.

46.     In 2013, Ms. Mbome again asked to travel to Maryland to visit her nephew.  At this time, Ms. Mbome learned that the Njies never renewed Ms. Mbome's documents as they said they would.  The Njies were aware that Ms. Mbome's visa expired after six months, but they represented to Ms. Mbome that they were taking care of the renewal process long after the visa expired.  Further, the Njies knew that Ms. Mbome's passport would and did expire in February 2013.

47.     When Ms. Mbome asked the Njies again about getting her documents renewed, the Njies told her there was no way to get them renewed and that she could not travel anymore. The Njies told Ms. Mbome that she could not fly because of her expired documents and that she was too old to make the trip from Texas to Maryland by bus.  Ms. Mbome was devastated by this news and asked the Njies how they could allow this to happen.

48.     On information and belief, the Njies intentionally failed to renew Ms. Mbome's documents.  The Njies sought to use and did use Ms. Mbome's expired travel documents as a means to further restrict her movements because they knew that Ms. Mbome could not travel with expired documents and could easily be deported.

**Ms. Mbome Entrusts Her Land in Cameroon to Mr. Njie's Care**

49.     Prior to coming to the United States, Ms. Mbome obtained a plot of land in Cameroon as compensation for work she performed there.  The property holds great importance to Ms. Mbome as it is the only property she owns and is the only thing of value she has to leave to her grandson.  Ms. Mbome one day hoped to build a house on this land to retire.

50.     Mr. Njie knew of Ms. Mbome's plot of land in Cameroon and her hope to live in a house built on the land.  After Ms. Mbome moved to the United States to work for Defendants, Ms. Mbome grew worried that there was no one to look after her property back in Cameroon.

51.     At Ms. Mbome's request, Mr. Njie obtained the paperwork relating to her plot of land during one of his regular trips to Cameroon and kept this paperwork when he returned to the United States.  Ms. Mbome asked Mr. Njie to look over the property for her.  Ms. Mbome relied on Mr. Njie to care for her land because he made regular trips to Cameroon, which Ms. Mbome was unable to do.  Ms. Mbome also knew that Mr. Njie had the necessary experience to safeguard her property interest because he had built several homes in Cameroon before and had

business relationships with contractors.  At least once after Mr. Njie returned from a trip to Cameroon, Ms. Mbome inquired about the status of her property because she trusted Mr. Njie to take care of the property.

52.    To date, Mr. Njie has never returned the paperwork for Ms. Mbome's land in Cameroon and has provided no information about the status of that land.

### The Njies Kicked Ms. Mbome Out Without Compensation

53.    In or around October 2015, the Njies told Ms. Mbome they no longer needed her services and that it was time for her to leave their home.

54.    The Njies explained to Ms. Mbome that they had built a house in Cameroon for her to live in when she returned.

55.    As mentioned above, Ms. Mbome had previously told Mr. Njie that she hoped to return to her plot of land in Cameroon and live in a house built on the land.  Initially, Ms. Mbome believed the house the Njies claimed to have built was on her land in Cameroon.  Ms. Mbome knew that Mr. Njie still had the documents for her land as well.

56.    Ms. Mbome requested details from the Njies about the house they claimed to have built for her.  However, the Njies did not provide details, nor did they show Ms. Mbome any documentation for the house, such as a deed, keys, or any proof of property ownership.  Instead, they showed Ms. Mbome a picture on a cell phone.  From the picture, Ms. Mbome was unable to discern any reliable information about the house.

57.    Ms. Mbome did not feel safe returning to Cameroon to live in the house without more information.

58.    Ms. Mbome later learned from her nephew that the house was built on the Njies' land in Cameroon so they could take the house back when Ms. Mbome died.  Because the house

was not built on her land, Ms. Mbome would not own the house. This discovery was extremely distressing to Ms. Mbome. Ms. Mbome thought that if the house was built on her own land, she could retire there in peace and eventually pass the house on to her grandson. Ms. Mbome also thought that a house she would own could serve as a form of compensation for her eight years of hard work.

59.     Ms. Mbome questioned the Njies regarding why the house was not built on her property, which caused the Njies to become very angry. Mr. Njie acted as if Ms. Mbome should not dare to question his authority. The Njies reminded Ms. Mbome that she did not have any children, which Ms. Mbome understood to mean that she should be grateful for whatever the Njies decided to offer her because she was old and alone with no one to care for her.

60.     Ms. Mbome knew that she could not allow the Njies to treat her this way simply because her son had passed away. Instead, she told the Njies that she wanted to be paid monetarily for her years of service. In response, the Njies attempted to convince Ms. Mbome to accept the house by claiming she was owed, at best, $96,000 for her eight years of service (based on a figure of $1,000 per month), which was allegedly less than the value of the house in Cameroon. Still, Ms. Mbome would not own the house, and the Njies would keep all of the value in the house themselves.

61.     Although she had been expressly warned by Ms. Mbella not to discuss the terms of her payment, Ms. Mbome summoned her courage and attempted to negotiate with Defendants by agreeing to accept a monetary payment of $75,000. In response, Mrs. Njie and Ms. Mbella verbally abused Ms. Mbome by calling her ungrateful and accusing her of being a thief. Mrs. Njie and Ms. Mbella menaced and terrorized Ms. Mbome by cornering her and yelling at her.

62.     At this time, Ms. Mbome began to fear for her physical safety.  Ms. Mbome depended on the Njies for all of her basic needs and knew that she would have no means to defend herself against an attack.  Further, Ms. Mbome feared that if she were to return to Cameroon and begin living in the house, the Njies would send someone to harm her—and perhaps kill her—so they could take the property back when she died.  Ms. Mbome knew that she could never safely accept the house offered by the Njies.

63.     The Njies countered Ms. Mbome's request to be paid monetarily by stating that any monetary amount paid would need to be reduced by the sum of Ms. Mbome's living expenses and other costs over the course of her time working for them.  Despite this, Defendants never entertained further discussions with Ms. Mbome about the amount she was owed or making payment to her.  Instead, Defendants focused on ridding themselves of Ms. Mbome for good.

64.     In or around May 2016, Mrs. Njie told Ms. Mbome that she had better be gone from the Njies' home before Mr. Njie returned from an ongoing trip to Cameroon.  On information and belief, Mrs. Njie told Ms. Mbome this on instruction from Mr. Njie.

65.     Ms. Mbome was very concerned by this statement as she did not know where else she could go and still had not been paid by the Njies.  However, when Ms. Mbome tried to insist otherwise, Mrs. Njie and Ms. Mbella told Ms. Mbome she would see what would happen to her if she did not leave the house.

66.     Although Ms. Mbome still hoped to obtain payment for her services, Mrs. Njie saw to it that Ms. Mbome was indeed gone before Mr. Njie returned.  One day, Mrs. Njie told Ms. Mbome that her time was up.  With little notice, Mrs. Njie placed Ms. Mbome—then nearly 70 years' old and unable to effectively communicate in English—on a three-day, one-way bus

journey from Texas to Maryland by herself.  Ironically, this was the same journey that the Njies had previously told Ms. Mbome that she would not be physically able to make.

67.      As Mrs. Njie hurried Ms. Mbome out of the Njies' home to the bus station, she told Ms. Mbome that she was giving her $5,000.  However, Mrs. Njie demanded that Ms. Mbome sign a document written by the Njies before she handed over the money that Ms. Mbome desperately needed.  This document purported to release the Njies from all legal responsibility for Ms. Mbome regarding her "stay" in the United States – an implicit acknowledgement of their legal responsibility for her presence in the United States prior to this point.  Ms. Mbome initially refused to sign the document.  However, under intense pressure from Mrs. Njie and in need of whatever cash she could get, Ms. Mbome signed the document even though she could not read the statement, as she cannot read in any language.

### Mr. Njie's Criminal History and Threats Toward Ms. Mbome

68.      Ms. Mbome has feared and continues to fear physical harm from Defendants, including in particular Mr. Njie.  Mr. Njie is known for having a short temper and has previously resorted to criminal, physical violence when angry.

69.      For instance, in 2012, Mr. Njie was convicted of criminal assault after he punched a man repeatedly in the face and choked and dragged the same man by a scarf tied around the man's neck.  This brazen physical assault took place at a public gathering in view of multiple witnesses.

70.      Unfortunately, this assault is not an isolated event in Mr. Njie's history.  On information and belief, Mr. Njie also physically assaulted his mother-in-law and co-defendant, Ms. Mbella, in December 2017.  Mr. Njie attacked Ms. Mbella and struck her in the face over a disagreement about property owned by Ms. Mbella in Cameroon that Mr. Njie was overseeing on

14

her behalf.   After this event—which occurred while Mr. Njie's children and Ms. Mbella's grandchildren were present—Mr. Njie was detained by local authorities and removed from the Njies' family home.

71.    These attacks illustrate Mr. Njie's capacity to act irrationally, dangerously, and violently.

72.    Further, Ms. Mbome has learned from friends in Cameroon that Mr. Njie is, or has been, trying to get her deported from the United States.  This threat has caused Ms. Mbome great distress and made her feel worthless.  Importantly, Ms. Mbome fears that if she were forced to return to Cameroon, Mr. Njie and the other Defendants would try to physically harm her and even kill her.  Mr. Njie's family in Cameroon is wealthy and powerful.  By contrast, with few close family members remaining in Cameroon, Ms. Mbome would be defenseless against a physical attack orchestrated by Defendants.

### Defendants' Conduct Had Psychological Effects on Ms. Mbome

73.    Ms. Mbome has sought treatment for the psychological trauma she has endured, and she is still fearful of what Defendants might do to her because they know where she lives and they have money and power.

74.    Ms. Mbome has been evaluated by mental health professionals who found that she exhibits psychological distress manifesting in symptoms of Post-Traumatic Stress Disorder, depression, and somatic distress.

### Ms. Mbome is Granted a "T-Visa" by USCIS

75.    On May 21, 2018, United States Citizenship and Immigration Services ("USCIS") notified Ms. Mbome that it had reviewed and approved her application for T-1 Nonimmigrant

Classification, a designation reserved for those individuals that USCIS determines to be "victim[s] of a severe form of trafficking in persons, also known as human trafficking."[1]

## Conditions Precedent

76.    All conditions precedent have been performed or have occurred.

## V.    CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF
Trafficking Victims Protection Reauthorization Act; Forced Labor
(18 U.S.C. § 1589)

77.    Ms. Mbome realleges and incorporates by reference all allegations contained in the preceding paragraphs as if fully set forth herein.

78.    The TVPRA imposes civil liability on any person who knowingly provides or obtains labor or services of a person by any one of, or any combination of, the following means: (1) by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person; (2) by means of serious harm or threats of serious harm to that person or another person; (3) by means of the abuse or threatened abuse of law or legal process; or (4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint.  18 U.S.C. § 1589(a).

79.    The TVPRA defines serious harm as "harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm." 18 U.S.C. § 1589(c)(2).

---

[1] U.S. Citizenship and Immigration Services, *I-914, Application for T nonimmigrant Status*, https://www.uscis.gov/i-914 (last visited June 7, 2018).

80.     Defendants knowingly obtained the labor and services of Ms. Mbome by means of physical restraint and by means of a scheme, plan, or pattern intended to cause her to believe that she would suffer serious harm if she did not perform such services.

81.     Defendants knowingly obtained the labor and services of Ms. Mbome by exploiting Ms. Mbome's lack of education and social status to manipulate and control her.  Ms. Mbome is illiterate, speaks very little English, and had never traveled outside of Cameroon prior to coming to the United States to work for the Njies.

82.     Ms. Mbella specifically told Ms. Mbome that she should not discuss the terms of her compensation with the Njies.  Ms. Mbome trusted Ms. Mbella and followed that instruction for years before she attempted to secure payment for herself.  This scheme allowed Defendants to take advantage of Ms. Mbome's work for eight years without paying her.

83.     Defendants knowingly obtained Ms. Mbome's labor and services by withholding her compensation, failing to provide her with personal care needs, and confiscating her visa and passport under the pretense of getting them renewed.  All of these acts by Defendants served to physically restrain Ms. Mbome by limiting her ability to travel or meaningfully live outside of the Njies' care.  Ms. Mbome was in fact physically restrained from traveling due to Defendants' actions. Defendants knowingly obtained Ms. Mbome's services by means of serious harm or threats of serious harm to her financial well-being.  By refusing to pay Ms. Mbome for her work, the Njies caused Ms. Mbome to be entirely financially dependent on them for all of her basic needs.  By knowingly allowing Ms. Mbome's travel documents to expire, the Njies also placed Ms. Mbome at serious risk of harm of arrest, detainment, and removal from the country.

84.     Because of Defendants' conduct, Ms. Mbome had no other option but to continue working for the Njies.   Ms. Mbome is authorized to bring a civil cause of action against

Defendants pursuant to the civil remedies provision of the TVPRA and is entitled to compensatory and exemplary damages and attorneys' fees.  18 U.S.C. § 1595.

## SECOND CLAIM FOR RELIEF
Trafficking with Respect to Peonage, Slavery, Involuntary Servitude or Forced Labor
(18 U.S.C. § 1590)

85.     Ms. Mbome realleges and incorporates by reference all allegations contained in the preceding paragraphs as if fully set forth herein.

86.     The TVPRA provides that it is a violation to knowingly recruit, harbor, transport, provide, or obtain by any means, any person for labor or services in violation of the TVPRA.

87.     Defendants knowingly recruited, transported, harbored, and obtained Ms. Mbome for labor and services in violation of the TVPRA.

88.     Ms. Mbella, in conjunction with and on behalf of the Njies, recruited Ms. Mbome to travel to the United States to work for the Njies.  Ms. Mbella arranged for Ms. Mbome to obtain a passport and visa by filling out the necessary forms, telling Ms. Mbome how to answer visa interview questions, accompanying Ms. Mbome to the visa interview, and answering most of the interview questions for Ms. Mbome.

89.     The Njies purchased Ms. Mbome's plane ticket to the United States and picked her up from the airport upon her arrival to bring her to their home to work for them.

90.     Ms. Mbome suffered the injuries detailed herein as a result of Defendants' actions.

91.     Ms. Mbome is authorized to bring a civil cause of action against Defendants pursuant to the civil remedies provision of the TVPRA and is entitled to compensatory and exemplary damages and attorneys' fees.  18 U.S.C. § 1595.

## THIRD CLAIM FOR RELIEF

Unlawful Conduct with Respect to Documents in Furtherance of Trafficking, Peonage, Slavery, Involuntary Servitude, or Forced Labor
(18 U.S.C. § 1592)

92.     Ms. Mbome realleges and incorporates by reference all allegations contained in the preceding paragraphs as if fully set forth herein.

93.     It is a violation of the TVPRA to knowingly destroy, conceal, remove, confiscate, or possess any actual or purported passport or other immigration document, or any other actual or purported government identification document, of another person in the course of violating the TVPRA.

94.     The Njies knowingly confiscated and possessed Ms. Mbome's passport and visa under the false pretenses of renewing the documentation, while the Njies actually allowed Ms. Mbome's documents to expire.

95.     The Njies used Ms. Mbome's expired documentation to restrict her liberty to move and travel, further subjecting her to forced labor and involuntary servitude.

96.     Ms. Mbome suffered the injuries detailed herein as a result of Defendants' actions.

97.     Ms. Mbome is authorized to bring a civil cause of action against the Njies pursuant to the civil remedies provision of the TVPRA and is entitled to compensatory and exemplary damages and attorneys' fees.  18 U.S.C. § 1595.

## FOURTH CLAIM FOR RELIEF

Conspiracy to Violate 18 U.S.C § 1589 and § 1590
(18 U.S.C. § 1594)

98.     Ms. Mbome realleges and incorporates by reference all allegations contained in the preceding paragraphs as if fully set forth herein.

99.     The TVPRA provides that whoever conspires with another person to violate §
1589, 1590, or 1592 of the TVPRA shall be held liable in the same manner as a completed
violation of such section.

100.     Ms. Mbella conspired with the Njies to bring Ms. Mbome to the United States for
the purpose of forced labor and involuntary servitude and therefore should be held liable to the
same extent for violations of § 1589 and § 1590.

### FIFTH CLAIM FOR RELIEF
Violation of the Trafficking Victims Protection Act: Benefiting Financially from Trafficking
(18 U.S.C. § 1593A)

101.     Ms. Mbome realleges and incorporates by reference all allegations contained in
the preceding paragraphs as if fully set forth herein.

102.     The TVPRA provides that whoever knowingly benefits, financially or by
receiving anything of value, from participation in a venture which has engaged in any act in
violation of 18 U.S.C. § 1592, knowing or in reckless disregard of the fact that the venture has
engaged in such violation, shall be fined under this title to the same extent for completed
violations of § 1592.

103.     From approximately April 2008 to May 2016, Ms. Mbome rendered valuable
service to the Njies by serving as a live-in nanny, cook, and housekeeper.

104.     Defendants failed to compensate Ms. Mbome for the fair market value of her
services.

105.     Defendants benefitted from these services financially and by receiving the value
of Ms. Mbome's housework and childcare without providing compensation to Ms. Mbome.

106.     Ms. Mbome waited on and cared for Ms. Mbella as a houseguest of the Njies on
multiple occasions, and Ms. Mbella also received the benefit of Ms. Mbome's services.

107.    Defendants obtained this benefit through participation in a venture, the illegal trafficking of Ms. Mbome in the United States and seizure of her passport during her time in this country, which violated, *inter alia*, § 1592 of the TVPRA, while knowing, or in reckless disregard of the fact that, the venture constituted such a violation as demonstrated by the Njies' false representations that they would extend her visa and passport.

108.    As a direct and proximate result of Defendants' actions, Ms. Mbome suffered harm in that she was subject to eight years of labor without pay.

109.    Ms. Mbome is authorized to bring a civil cause of action against Defendants pursuant to the civil remedies provision of the TVPRA and is entitled to compensatory and exemplary damages and attorneys' fees.  18 U.S.C. § 1595.

**SIXTH CLAIM FOR RELIEF**
Fair Labor Standards Act ("FLSA") – Failure to Pay Wages
(29 U.S.C. § 201, *et. seq.*)

110.    Ms. Mbome realleges and incorporates by reference all allegations contained in the preceding paragraphs as if fully set forth herein.

111.    The FLSA provides that a person employed in domestic service in a household shall be paid minimum wage as required by law.  29 U.S.C. § 206(f).  This includes domestic service employees who live in a household where they are employed.  29 C.F.R. § 552.102.

112.    The Njies were "employers" within the meaning of the FLSA, but did not pay Ms. Mbome the minimum wage for the domestic services she provided for the Njies.  29 U.S.C. § 203(d), (g).

113.    At all relevant times, Ms. Mbome was an "employee" within the meaning of the FLSA.  29 U.S.C. §§ 203(e), 206(f)(1).

114.    At all relevant times, Ms. Mbome was not exempt from the minimum wage provisions of the FLSA.  *See* 29 U.S.C. §§ 206(a), 213.

115.    The FLSA requires that employers pay non-exempt live-in domestic service employees a minimum wage for all hours worked pursuant to 29 U.S.C. § 206(a)(1) and 29 C.F.R. § 552.102.

116.    The Njies knowingly and willfully violated the FLSA when they failed to pay Ms. Mbome the statutorily mandated minimum wage for all hours worked pursuant to 29 U.S.C. § 206(a)(1) and 29 C.F.R. § 552.102.

117.    The minimum wage from April 2008 to July 23, 2008 was $5.85 an hour.  The minimum wage from July 24, 2008 to July 23, 2009 was $6.55 an hour.  The minimum wage from July 24, 2009 to May 2016 was $7.25 an hour.  29 U.S.C. § 206(a)(1).  The Texas minimum wage from April 2008 to May 2016 has been set at the same rate as the federal minimum wage.

118.    Upon information and belief, the Njies further failed to keep complete records of hours worked and wages paid, as required by 29 C.F.R. § 516.  Additionally, the Njies failed to post notices required by 29 C.F.R. § 516.4.

119.    The Njies' actions in violation of 29 U.S.C. § 206(a)(1) and 29 C.F.R. § 552.102 were willful, as shown by their refusal to provide Ms. Mbome with her requested compensation and their statements that they would compensate her in ways and amounts less than as required by law.

120.    The Njies knew, should have known, or showed reckless disregard for the FLSA minimum wage provisions applicable to Ms. Mbome and willfully, knowingly, and without good faith violated these laws.

121.    As a result of the Njies' willful violations of the FLSA, pursuant to 29 U.S.C. § 216(b), Ms. Mbome is entitled to recover her unpaid wages, an additional equal amount in liquidated damages, reasonable attorneys' fees and costs, pre-judgment and post-judgment interest as provided by law, and any other relief deemed appropriate by the Court.

## SEVENTH CLAIM FOR RELIEF
Civil Action under Texas Civil Practice & Remedies Code - Liability for Trafficking of Persons
(Tex. Civ. Prac. & Rem. Code §§ 98.001, 98.002)

122.    Ms. Mbome realleges and incorporates by reference all allegations contained in the preceding paragraphs as if fully set forth herein.

123.    Ms. Mbome is authorized to bring these civil claims against the Njies pursuant to the Texas Civil Practice and Remedies Code.

124.    The Njies and Ms. Mbella knowingly transported Ms. Mbome to the United States to provide labor and services.

125.    Defendants knowingly received a benefit in transporting Ms. Mbome to the United States by receiving labor or services without compensating Ms. Mbome.

126.    Defendants' liability entitles Ms. Mbome to recover actual damages, including damages for mental anguish, court costs, and reasonable attorneys' fees.  Ms. Mbome is also entitled to and seeks exemplary damages.

## EIGHTH CLAIM FOR RELIEF
Fraud

127.    Ms. Mbome realleges and incorporates by reference all allegations contained in the preceding paragraphs as if fully set forth herein.

128.    Prior to Ms. Mbome's arrival in the United States, Ms. Mbella, in her capacity as the Njies' agent, falsely represented to Ms. Mbome that if she came to the United States to work for the Njies, she would be fairly compensated.  Specifically, Ms. Mbella represented to Ms.

23

Mbome that Mr. Njie knew what he intended to pay her when, in fact, Defendants knew that this representation was false and Defendants had no intention to compensate Ms. Mbome for her services.   Rather, Defendants intended to subject Ms. Mbome to trafficking, involuntary servitude, and forced labor.

129.    Defendants intended that their misrepresentation would induce Ms. Mbome to work for them in the United States.

130.    Relying on Defendants' representation that she would be compensated for her work, Ms. Mbome traveled to the United States to work for the Njies.  Ms. Mbome never would have come to the United States had she known she would not be paid for her work.

131.    In addition, Defendants falsely represented to Ms. Mbome that they would renew her passport and visa so that she could legally remain in the United States.

132.    Despite this representation, Defendants took no steps to renew Ms. Mbome's travel documents and instead intentionally allowed them to expire in order to further confine and restrict Ms. Mbome's movements.

133.    Ms. Mbome relied on Defendants' representations to her detriment and was placed at risk of detention and deportation when her travel documents expired.

134.     As a result of Defendants' fraud, Ms. Mbome is entitled to recover actual damages, including damages for mental anguish.   Ms. Mbome is also entitled to and seeks exemplary damages, court costs, and all pre-judgment and post-judgment interest allowed by law.

### **NINTH CLAIM FOR RELIEF**
Theft of Services (Tex. Penal Code § 31.04; Tex. Civ. Prac. & Rem. Code § 134.001, *et seq.*)

135.    Ms. Mbome realleges and incorporates by reference all allegations contained in the preceding paragraphs as if fully set forth herein.

136.    Under Texas Penal Code Section 31.04(1), a person commits theft if, with intent to avoid payment for service that the actor knows is provided for compensation, the actor intentionally or knowingly secures performance of the service by deception, threat, or false token.  The Texas Theft Liability Act authorizes a person who has sustained damages resulting from theft to bring a civil suit against the person who committed the theft.  *See* Tex. Civ. Prac. & Rem. Code. §§ 134.001-.005.

137.    Ms. Mbome provided labor or professional service as defined in Texas Penal Code Section 31.01(6)(A) to the Njies when she served as their live-in nanny, cook, and housekeeper from April 2008 to May 2016.

138.    The Njies knew that Ms. Mbome provided the services with the expectation that she would be fairly compensated.  The Njies intentionally or knowingly secured Ms. Mbome's performance of the services through deception.  The Njies, through their agent Ms. Mbella, falsely represented to Ms. Mbome that she would be compensated for her services.  Ms. Mbome never would have come to the United States to work for the Njies had she known she would not be paid for her work.

139.    Ms. Mbome has been damaged by Defendants' theft of services and is entitled to recover and seeks actual damages, additional damages of $1,000 under Texas Civil Practice and Remedies Code Section 134.005, exemplary damages, attorneys' fees, court costs, and all pre-judgment and post-judgment interest allowed by law.

### TENTH CLAIM FOR RELIEF
Breach of Implied Contract (Labor)

140.    Ms. Mbome realleges and incorporates by reference all allegations contained in the preceding paragraphs as if fully set forth herein.

141.    Ms. Mbome had an implied-in-fact employment contract with the Njies to provide housekeeping, cooking, and childcare services to the Njies in exchange for fair compensation. Defendants agreed to fairly compensate Ms. Mbome for her services.

142.    From April 2008 to May 2016, Ms. Mbome performed contractual services by serving as a live-in nanny, cook, and housekeeper.

143.    From April 2008 to May 2016, the Njies instructed Ms. Mbome on what services to perform and accepted Ms. Mbome's housekeeping, cooking, and childcare services.

144.    The Njies breached their implied-in-fact contract with Ms. Mbome by refusing to pay Ms. Mbome the proper rate for the services she performed pursuant to the implied-in-fact contract.

145.    As a direct and proximate result of Defendants' actions, Ms. Mbome has suffered economic loss.

146.    Ms. Mbome is entitled to recover actual and consequential damages, in addition to attorneys' fees under Texas Civil Practice and Remedies Code Section 38.001, and all pre-judgment and post-judgment interest allowed by law.

## ELEVENTH CLAIM FOR RELIEF
### Quantum Meruit

147.    Ms. Mbome realleges and incorporates by reference all allegations contained in the preceding paragraphs as if fully set forth herein.

148.    From April 2008 to May 2016, Ms. Mbome rendered valuable services to the Njies by serving as a live-in nanny, cook, and housekeeper in good faith, and with reasonable expectation, that she would be fairly compensated for her services.

149.    The Njies accepted and benefited from Ms. Mbome's years of services and had reasonable notice that Ms. Mbome expected to be compensated for her services; however, the Njies failed to compensate Ms. Mbome for the fair market value of her services.

150.    As a direct and proximate result of the Njies' actions, Ms. Mbome has suffered economic loss.

151.    Ms. Mbome is entitled to recover damages, including actual damages, attorneys' fees under Texas Civil Practice and Remedies Code Section 38.001, court costs, and all pre-judgment and post-judgment interest allowed by law.

### JURY DEMAND

152.    Ms. Mbome is entitled to and hereby demands a jury trial in this matter.

### PRAYER FOR RELIEF

153.    WHEREFORE, Ms. Mbome requests that this Court enter judgment in her favor and grant her the following relief:

a.    Award Ms. Mbome her unpaid minimum wages, plus an equal amount in liquidated damages, for Defendants' willful violation of the FLSA minimum wage provision, 29 U.S.C. § 206;

b.    Award Ms. Mbome actual and compensatory damages, including damages for mental anguish;

c.    Award Ms. Mbome pre-judgment and post-judgment interest as allowed by law;

d.    Award Ms. Mbome her costs of court and costs of litigation;

e.    Award Ms. Mbome restitution damages;

f.    Award Ms. Mbome consequential damages;

g.    Award Ms. Mbome exemplary damages;

h.   Award Ms. Mbome additional damages up to $1,000 pursuant to Texas Civil

Practice and Remedies Code Section 134.005;

i.   Award Ms. Mbome attorneys' fees pursuant to Texas Civil Practice and Remedies

Code Sections 38.001 and 134.005, 29 U.S.C. § 216(b), 18 U.S.C. § 1595(a); and

j.   Award Ms. Mbome such other relief as this Court deems just and proper.


Dated: July 20, 2018


Respectfully submitted,

By: /s/ Matthew V. Lloyd
    Matthew V. Lloyd (TX Bar No. 24083404)
    mvlloyd@akingump.com
    Akin Gump Strauss Hauer & Feld LLP
    1700 Pacific Avenue, Suite 4100
    Dallas, TX 75201
    Telephone:  214-969-2800
    Facsimile:  214-969-4343

    Corey W. Roush (DC Bar No. 466337)
    *(Pro Hac Vice Pending)*
    croush@akingump.com
    Akin Gump Strauss Hauer & Feld LLP
    Robert S. Strauss Building
    1333 New Hampshire Avenue, N.W.
    Washington, D.C. 20036
    Telephone:  202-887-4115
    Facsimile:  202-887-4288


    ***Attorneys for Plaintiff Bridget Namondo Mbome***